STATE OF DELAWARE V. GEORGE WASHINGTON MOORE.

STATE OF DELAWARE V. GEORGE WASHINGTON MOORE.

STATE OF DELAWARE V. ELWOOD C. WILLIN.

(*January* 9, 1963.)

LYNCH, J., sitting.

*Thomas Herlihy, III*, Deputy Attorney-General, for the State of Delaware.

*David C. Rittenhouse* (of the firm of Morris, Nichols, Arsht and Tunnell) for the Defendants.

Superior Court for New Castle County; No. 336, Cr. A, 1962, Carrying a Concealed Deadly Weapon (Title 11, *Delaware Code* Sec. 463); No. 337, Cr. A., 1962, Failing to Drive to the Right of a Highway (Title 11, *Delaware Code* Sec.

4130(a); No. 338, Cr. A., 1962, Carrying a Concealed Deadly Weapon (Title 11, *Delaware Code* Sec. 463).

LYNCH, J.:

Defendants are charged with carrying concealed a deadly weapon, *i.e.* revolvers, in violation of Title 11 *Del. C.* § 463. Defendant Moore is also charged with failing to drive a slow moving vehicle as close as possible to the right side of a highway in violation of Title 21 *Del. C.* § 4130(a). When he was before the Common Pleas Court he was also charged with driving without an operator's license. He pleaded guilty to this charge. There was no appeal from the sentence.

Defendants moved on July 6, 1962 to suppress evidence taken from their persons, and from the car Moore was operating, *i.e.* revolvers, a pair of gloves, and a bandana-handkerchief, formed in a triangle, which were found on the front seat of the car which Moore was operating when apprehended and in which defendant Willin was riding as a passenger. An affidavit made by Corporal O'Neal of the Delaware State Police was filed by the State in support of its motion to dismiss defendants' motions to suppress—as filed untimely—it

appearing therefrom that defendants had been arrested on February 27, 1962 and they had been taken before the Court of Common Pleas on March 8, 1962 where Moore pleaded guilty to the charge of driving without an operator's license. Both were tried and found guilty of carrying concealed a deadly weapon and Moore was also convicted of failing to drive to the right side of a highway as required by statute. Each appealed to this Court from their convictions by the Court of Common Pleas and were arraigned before this Court on June 8, 1962. Counsel was appointed to defend each of them and they announced they were ready for trial. On July 6, however, defendants' motions to suppress were filed and their trial was continued on July 10, 1962 because of their pending motions to suppress and the State's motion. Because of the conflicting statements in and between the allegations appearing in the affidavits the Court ordered a hearing on all motions. Following a number of hearings and following the filing of briefs, the case is now ready for decision.

From the credible evidence heard, the Court finds that Trooper O'Neal of the Delaware State Police was patrolling in an unmarked car on Highway #13, a dual highway, in the vicinity of the Wilmington Airport, in the early morning hours of February 27, 1962. Just south of this airport there is a service station, located on the west side of the southbound lane of Route #13, which service station stays open all night. Trooper O'Neal noticed the car operated by defendant Moore proceeding very slowly on the southbound lane; Moore was watching this gas station; Moore's car "was swerving on the roadway" because of Moore's seeming interest in the gas station. The Moore car did not stop at the gas station but proceeded past it. Shortly thereafter Trooper O'Neal again observed Moore's car—this time proceeding in a northerly direction very slowly in the inside lane on the northbound lane of Route #13, and in the vicinity of this same gas station— and again the driver Moore was watching what was going on at the gas station. Again Moore did not stop at the gas sta-

tion but went by it. Trooper O'Neal, maintaining his observation of the Moore car, saw it again drive south slowly past this same gas station; Moore still was watching the station but he continued past it; he proceeded to the intersection of Route #13 and a road leading to New Castle known as Hare's Corner, where he went to the northbound lane.

Apparently the Moore car traveled back and forth on Route #13 in the immediate vicinity of this gas station a number of times—all as observed by Trooper O'Neal.

Ultimately, Trooper O'Neal saw the Moore car operating in the left or inside lane of Route #13; then he observed it cutting across the three lanes to the east and come to a stop in a Shell station. The Moore car did come to a stop at the entrance of this Shell gas station, which was located on the east side of the northbound lane of Route #13.

This Shell station was closed for the night but there were lights in and about the station that afforded some illumination. Trooper O'Neal pulled up parallel and close to the Moore car and got out of his car and approached the Moore car. He drew his side arms and ordered Moore to step out of his car. As Moore got out of the driver's side of the car Trooper O'Neal noticed that the upper pocket of Moore's jacket had been ripped—it was hanging and there was some heavy object in it. Trooper O'Neal "frisked" Moore (patted the outside of his clothes) and in doing so detected the outlines of a gun. Trooper O'Neal took this gun from the jacket pocket. This gun was a 38-30 caliber automatic pistol, fully loaded, and had been in the ripped jacket pocket. Moore was told he was under arrest for carrying concealed a deadly weapon and the Trooper directed Moore to put his hands up and on the roof of his car.

Trooper O'Neal then turned his attention to the other person in the car, the defendant Willin. He was sitting in the passenger side of the Moore car. Trooper O'Neal ordered him

to get out of the car, and he noted as Willin got out that the pocket of his jacket was also ripped and it too appeared to have a heavy object in it. Trooper O'Neal "frisked" Willin and felt the outline of a gun in this jacket pocket. The Trooper then removed a 32 caliber Harrington and Richardson 5 shot revolver from Willin's ripped jacket pocket and told Willin he was under arrest for carrying concealed a deadly weapon. Trooper O'Neal called a nearby State Police Station for assistance and two other State Troopers quickly came to the scene. Defendants were handcuffed and taken to the Police Station for questioning. Defendants, in their affidavits, each concede that in the course of questioning they advised the Troopers they were paroled convicts, having been convicted of armed robbery. When the questioning was completed —in something less than 2 hours—Trooper O'Neal took the defendants to a Magistrate where he typed up the several charges made against them. The defendants asked for trial before the Common Pleas Court. After trial there they were convicted as heretofore noted and their cases are here on appeal.

Counsel for defendants first contends that Trooper O'Neal could not "search" the defendants when they were apprehended because he had no search warrant. That issue was disposed of in *State v. Halko*, 5 Storey 385, 204 A. 2d 628, on the basis of the reported opinion of our Supreme Court in *Halko v. State*[1], 4 Storey 180, 175 A. 2d 42 (1961).

In *United States v. Rabinowitz*, 339 U. S. 56, 65, 70 S. Ct. 430, 435, 95 L. Ed. 653, the Supreme Court of the United States ruled it was not absolutely necessary to have a

---

[1]There is some doubt as to the validity of a search incidental to an arrest for a traffic violation, compare 21 *Del. C.* § 701. The cited case upholds a search in a case arising from an arrest for drunken driving, a traffic violation under our statute. It may be otherwise in cases involving less serious traffic violations, *People v. Mayo*, 19 Ill. 2d 136, 166 N. E. 2d 440 1960), but compare *People v. Watkins*, 19 Ill. 2d 11, 166 N. E. 2d 433, 437 (1960).

search warrant; "* * * the reasonableness of the search [can depend upon] a lawful arrest * * *" and if there is a lawful arrest a lawful search of the person can follow. In *Rabinowitz* the U. S. Supreme Court overruled *Trupiano v. United States,* 334 U. S. 699, 68 S. Ct. 1229, 92 L. Ed. 1663 (1948), which had previously decided a search warrant was needed even though there may have been a lawful arrest.

Many of the contentions advanced and arguments asserted by the defendants are disposed of in the *Halko* decisions referred to above. No further reference need be made to them. To the extent they are not I propose to analyze and determine them herein.

Defendants' arguments really seem to be that their apprehension and "detention" and consequent "arrest" by Trooper O'Neal cannot be justified as a matter of law, and therefore, their motions to suppress must be granted. I do not and cannot agree with these arguments.

The United States Supreme Court has, in late years, considered many cases involving alleged invalid arrests and illegal searches and relationship thereof to the Fourth Amendment of the Federal Constitution, now applicable to the several states by interpretation of the Fourteenth Amendment.

█ A consideration of the Fouth Amendment to the Federal Constitution and Section 6 of Article I of the Constitution of Delaware, Del. C. show their purposes are the same; if the Fourth Amendment is violated because of an "unreasonable" search and/or seizure it would necessarily result in a violation of the cited provisions of the applicable Delaware Constitution. These constitutional provisions were clearly intended to put some restraint upon the circumstances under which police officers are authorized to make arrests. It is clear from the language appearing in each of these provisions that the people have a right "to be secure in their persons"

and against "unreasonable * * * seizures"; it does not mean or apply to "reasonable" searches and seizures.

Since *Mallory v. United States*, 354 U. S. 449, 454, 77 S. Ct. 1356 at p. 1359, 1 L. Ed. 2d 1479 at p. 1483 (1957) is very clear that "* * * The police may not arrest upon mere suspicion but only on 'probable cause.' * * *" The judgment to be put on the legal significance of the circumstances that lead to the "detention" and "arrest" is for the Court. 6 *C. J. S.* Arrest § 73 (f), 5 *Am. Jur.* 2d Arrest—§ 49, p. 741.

There is an excellent discussion of the determination of the existence of "probable cause" in 5 *Am. Jur.* 2d in Section 48. I quote it at length:

"The existence of 'probable cause', justifying an arrest without a warrant, is determined by factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. It is a pragmatic question to be determined in each case in the light of the particular circumstances and the particular offense involved.

"Probable cause does not depend on the actual state of the case in point of fact, as it may turn out upon legal investigation, but on knowledge of facts and circumstances that would be sufficient to induce a reasonable belief in the truth of the accusation. It depends on the facts known, at the time of the arrest, to the person by whom the arrest is made, from which it follows that an arrest cannot be justified by what a subsequent search discloses. On the other hand, if probable cause existed at the time of the arrest, the fact that investigation proves the person arrested to be innocent does not make the arrest unjustifiable.

"In determining probable cause, all the information in the officer's possession, fair inferences therefrom, and observations made by him, are generally pertinent; and facts may be taken into consideration that would not be admissible on the issue of guilt. * *."

The Courts must be realistic in their consideration and the determination of such matters. Long experience with the police of this State and of the City of Wilmington convince me that we Judges must not be frightened with stories that our police are "witches" or "evil spirits", out to do all kinds of evil things in carrying out their work. When officers on night patrol observe persons or automobilists in questionable situations or acting in a suspicious manner, it is only realistic to recognize that they are usually imbued only with a desire to do their jobs, which is to afford protection and security to the community. I have never known of an instance where our police stop "innocent" pedestrians and motorists and put them through rigorous questions and searches. I am sure there are many citizens in this State who have reason to be grateful for what our police have done, since these persons have received aid and comfort from our police officers on night patrol when faced with fearful situations. The authority of the officers, not merely to stop and question such persons or automobilists, under the Uniform Arrest Act is clear.

Here, however, as has been pointed out *ante*, these defendants had been conducting themselves in a questionable manner for some considerable period of time and their actions reasonably aroused interest and suspicions in the mind of Trooper O'Neal and caused him to detain them; when they were detained for questioning an examination of their persons gave evidence to Trooper O'Neal's eyes they were armed up to their very teeth. Personal observation is not a "search", *People v. Martin,* 45 Cal. 2d 755, 290 P. 2d 855, 858, and cases cited. "Probable cause" to arrest can appear from what an officer observes of the conduct of suspects, including furtive actions on the part of the suspect particularly in the night time. The Supreme Court of California considered this in *People v. Kilvington,* 104 Cal. 86, 37 P. 799, and the factor that it was night when the officer acted, 37 P. 801, appeared to have been considered one of importance and given some emphasis.

■ It was entirely proper for Trooper O'Neal to have acted on the "tell-tale bulge" in the defendants' jackets—and it can be properly said that this would indicate the commission of a crime in his presence. See *Congleton v. Commonwealth*, 273 Ky. 282, 116 S. W. 300, 301. In that case an officer saw a "bulge " in appellant's shirt. When searched the "bulge" turned out to be a number of cartons of cigarettes. Objection was made to the reception in evidence of the cartons of cigarettes and testimony concerning the manner by which police had obtained them, but the Appellate Court upheld the conviction on the ground the offense had been committed in the officer's presence since he could tell from the "tell-tale bulge" that appellant had stolen cigarettes since the other knowledge of the officers had all led to the inference appellant had broken into a freight car. See also *Utah Liquor Control Commission v. Wooras*, 97 Utah 351, 93 P. 2d 455, 460, where the Utah Supreme Court said:

"* * * The meaning of 'acts committed in the presence of the arresting officer' is not elastic but as a general proposition is limited to acts that are committed within the arresting officer's knowledge * * * being obtained through his sight, hearing, or other senses, or by the offender's admission of the facts made before his arrest. * * *"

■■ The Court recognizes that Trooper O'Neal had to have such information in his possession as would constitute "probable cause" before he could make an arrest. But in light of what had been brought to his attention as of the time that defendants moved out of their car, can it be doubted that he did have the requisite "reasonable cause"? I say "No" and rule he did have "'reasonable cause".

The law requiring officers to act promptly in carrying out their duties and providing justification for their actions was stated long ago. In 2 *Hale, Pleas of the Crown*, 85, the duties of law enforcement officers was stated:

"And these are under a greater protection of the law * * * because they are by law punishable, if they neglect their duty in it.

"And therefore it is all the reason that can be, that they should have the greatest protection and encouragement in the due execution of their office, since their actings herein are not arbitrary but necessary duties, (not permissions) and under severe punishments in their neglect thereof."

Attention is also called to the dissent of Mr. Justice Clark in *Henry v. United States*, 361 U. S. 98, 106, 80 S. Ct. 168, 173, 4 L. Ed. 134, 141 (1959) where he said:

"When an investigation proceeds to the point where an [officer] has reasonable grounds to believe that an offense is being committed in his presence, he is obligated to proceed to make such searches, seizures, and arrests as the circumstances require. It is only by such alertness that crime is discovered, * * *. We should not place additional burdens on law enforcement agencies."

In short, officers must act almost instantaneously when deciding if suspects are to be detained and arrests made; and all in light of the citizens' rights as guaranteed by constitutional provisions and the interest of society in the suppression of crime and the police affording security and protection to the community.

There is an excellent article on the Law of Arrest in 25 *Iowa Law Rev.* 201,—written by Professor Perkins, a then Professor of Law at the University of Iowa. Some excerpts give inspiration to the thinking that our Courts should entertain in considering cases involving the Law of Arrest. Professor Perkins stated at page 207:

"* * * if an officer has lawful authority to make a search under circumstances which require the momentary detention of another person as an incident to the search, such detention

is not of itself an arrest although if the search should disclose the commission of a crime, an arrest might follow very promptly. * * *."

Professor Perkins comments, 25 *Iowa Law Rev.* at p. 235, on statutory provisions giving a peace officer the power of arrest:

"Consideration of statutory regulations of the privilege of a peace officer to arrest without warrant for an offense not committed in his presence should be prefaced by two comments. (1) To whatever extent this privilege exists it is accompanied by a corresponding duty. The officer has no free choice in the matter * * *; and any rule which *requires* instant action should permit the one who must act to do so on the reasonable appearances of the moment,—and protect him for any reasonable mistake of fact. To say to one: 'You *must* act instantly, but you do so at your peril and must take the risk of any mistake of fact, however reasonable' is clearly unjust. (2) There is no evidence of a deliberate intent to place such an added risk upon the peace officers * * * but some of the statutes *seem* to have done so by the inadvertent use of language originally intended to express only the position of the private person." (Emphasis by the author)

It is recognized that Professor Perkins was not considering constitutional limitations at the excerpted portions but it necessarily follows that if an officer is inhibited by such limitations in his actions in delaying or arresting a suspect he necessarily may become civilly liable for a false arrest and it is such considerations that give the excerpted portions a reasonable place in judicial thinking of any matter that relates to the law of arrest and search and seizure.

The opening paragraph of § 3.18, p. 275 of Harper & James, *The Law of Torts*, well states the problem:

"Arrest without warrant. The law of arrest represents the compromise between two conflicting interests of the highest

order—the interest in personal liberty and the interest in apprehension of criminals. It represents one of the most successful efforts of the common law to accommodate itself both to the needs of society and of its individual members."

Another article—Remington, "The Law Relating to 'On the Street' Detention, Questioning and Frisking of Suspected Persons and Police Arrest Privileges in General", published in 51 *Journal Crim. L. C. & P. S.* 386 (1960)—must be read and consideration given to the author's comments.

For instance, the author says, initially, at pages 386-387:

"There are four principal questions which will be discussed during this session. They are:

"(1) In the absence of sufficient grounds for an arrest, should the police have the right to stop and question a person as to his identity and reason for being where he is, if the appearance of conduct of that person has reasonably aroused police suspicion?

"(2) Should the police be permitted to search such a person for weapons or for incriminating evidence?

"(3) If police practices of this nature are to be legally sanctioned, what limitations should be imposed?

"(4) With respect to police arrest statutes generally, should more freedom be granted to police in recognition of their contentions that existing laws are obsolete and hamper police attempts to meet the public demand for adequate police protection?

"Traditionally, all of these issues have been dealt with by the law as a single problem of arrest despite the fact that there are obviously important differences between questioning or frisking on the one hand and taking a person into custody for purposes of prosecution on the other hand. This over-

simplified 'single problem' approach of the law has had unfortunate consequences. The failure of the law to deal adequately with some important law enforcement problems has left enforcement officials without sufficient guidance, thus creating unnecessary risks both for the officer and for the citizen with whom he deals. It is obvious that clear definition of the scope of legitimate power is important for the officer as well as for persons whose interests would be endangered by its abuse. Explanations for inadequacies in current law comes, in part, from the way the law has developed."

It has been a recognition by me of these points and a desire to convince defense counsel that Trooper O'Neal acted properly in doing what he did when apprehending the defendants that has prompted me to go the lengths that I have in this opinion.

Later in his article Mr. Remington discusses the very point that has caused defense counsel to complain so bitterly in oral argument and in his briefs, *i.e.* Trooper O'Neal's "frisking" of the defendants.

Mr. Remington says, page 391, *et seq.*:

"If the right to stop and question a suspect is recognized, then it follows that the officer ought to be allowed to frisk, under some circumstances at least, to insure that the suspect is not possessed of a dangerous weapon which would put the safety of the officer in peril.

"Certainly it is current practice to frisk some suspects as to whom there are not sufficient grounds for arrest. The Training Bulletin of the Los Angeles Department states:

" 'Although persons may appear to be logical suspects for interrogation, they often prove to be innocent of any crime. Unless the interrogation is to be more than a casual conversation, an officer should not place his hands on the person questioned. However, if there is any reason to believe that a

suspect is armed, he should be searched immediately for offensive weapons. It is seldom advisable to make a "wall shake-down" immediately upon contacting an individual unless he is known to be, or suspected of being, an armed or dangerous criminal. After a short explanation, the average innocent citizen will usually be able to comprehend the reason for a field interrogation, but he will seldom be convinced of the necessity for a "wall shake-down".'

"Usually courts which have recognized [*Gisske v. Sanders*, 9 Cal. App. 13, 98 P. 43, 1908] a privilege to stop and question a suspect have also recognized the right of the officer to frisk the suspect if the officer has reason to believe him dangerous. This is specifically provided for in the Uniform Arrest Act. On the other hand, it is frequently assumed that frisking is illegal unless, at the time, there were sufficient grounds for arrest."

The right to "frisk" is also considered in an article, which is to be found in Vol. 28, *Virginia Law Review* at page 315. The matter of searching suspects for weapons is considered at some length, starting on page 324:

"At common law, if a watchman came upon a suspiciously acting nightwalker, he might arrest him and then search him for weapons, but he had no right to search before arrest. There is no reason why such a right should have been granted; hoodlums with four-inch pistols were centuries in the future. The watchman could see whether the suspect carried a sword, staff, or bow and arrow. While the suspect might have a knife concealed on his person, the watchman could easily take a position in questioning him that would make his staff a far more effective weapon.

"Today, good police practice often requires a police officer to 'frisk' a suspect before questioning him, that is, to pass his hands over the latter's outer clothing to make sure that no dangerous weapons are concealed on his person. When

an officer encounters a man in a dark alley late at night, or under other circumstances which lead him to suspect that the man may be engaged in or have committed a crime, he should not immediately make an arrest, since answers to a question or two may instantly dispel his suspicions. Yet, it would often be the height of folly to converse with the suspect without first making certain that the latter is not fingering the trigger of a pistol.

"A police officer does not, and should not, 'frisk' everyone he questions, or even everyone he suspects of having committed a serious crime. But for him to limit 'frisking' to persons he reasonably believes are carrying concealed weapons is to risk his life needlessly. Therefore, the officer should 'frisk' every person he questions when, because of the appearance of the person, the time and place, the small number of police officers present, the seriousness of the offense he is investigating, or other circumstances, 'he reasonably believes that he is in danger if such person possesses a dangerous weapon.'

"In order to legalize such frisking, Section 3 of the Uniform Arrest Act provides:

" 'A peace officer may search for a dangerous weapon any person whom he has stopped or detained to question, as provided in section 2, whenever he has reasonable ground to believe that he is in danger if the person possesses a dangerous weapon. If the officer finds a weapon, he may take and keep it until the completion of the questioning, when he shall either return it or arrest the person. The arrest may be for the illegal possession of the weapon.'

"Enactment of Section 3 would probably have no effect on police practices. Police officers will continue to be governed by the instinct for self-preservation and to 'frisk' suspects whether or not such action is legal. Nevertheless, there are several advantages to be gained through legalizing this

necessary police practice. First, it is undesirable to have the law tell officers not to do something that the instinct for self-preservation requires them to do. The existence of one common situation in which it is obviously necessary to violate the law reduces their respect for all law and increases the likelihood of violations in less justified circumstances. Second, legalizing 'frisking' prevents a suspect who has been 'frisked' from suing the officer for damages. And the innocent person who is 'frisked' is less likely to feel that he has been unjustly treated and be unwilling to cooperate with the police. Third, if 'frisking' is legal, then resistance to 'frisking' is illegal, and therefore less likely to occur. Fourth, it is important that underworld characters carrying concealed pistols be punished. If 'frisking' is illegal, such convictions are difficult in states having the federal rule preventing the admissibility of illegally obtained evidence, since the pistol discovered by a 'frisk' before arrest, that is, an illegal search, would not be admissible.

"Section 3 is undoubtedly constitutional. It is axiomatic that an officer has authority, incident to a lawful arrest, to search the prisoner after the arrest and to take from him all dangerous weapons. The justification is the officer's safety, and this seems as applicable to searches incident to lawful questioning.

"The authorities reveal only one case, *Gisske v. Sanders*, [9 Cal. App. 13, 16 , 98 P. 43, 44 (1908)] dealing with the right of a police officer to search a suspect he is questioning. In that case in reversing a judgment against a police officer for a false arrest based on questioning accompanied by 'frisking' the court said:

" '* * * the officer did nothing which the plaintiff did not desire, except the examination of his person to see if he carried concealed weapons. This, however, was a precaution which the officer might well take under the circumstances of the meeting and the conduct of the plaintiff, whether plaintiff was under arrest or not.' "

■ The Fourth Amendment only condemns "unreasonable" searches and seizures; "reasonable" seizures or arrests are not comprehended within the Amendment. If an officer has "reasonable ground" to stop a person "abroad", as the phrase appears in the Uniform Arrest Act, Title 11 *Delaware Code*, § 1902(a)—"[a] peace officer may stop any person abroad who he has reasonable ground to suspect * * * is about to commit a crime * * *"—it seems very clear that such person may be "detained" for a limited period for given reasons; "frisked" as is discussed later and "arrested" if the facts warrant. If there is a valid "arrest", the arresting officers have power to make a valid "search", *State v. Halko, supra*, 175 A. 2d 42, 46; and *Aqnello et al. v. United States*, 269 U. S. 20, 31, 46 S. Ct. 4, 5, 70 L. Ed. 145 at p. 148 (1925).

Delaware has other statutes, which should be considered with the facts found by the Court in this case. For instance, 11 *Del. C.* § 462 (which has been in effect since 1915) provides:

"Any peace officer of the State * * * may make a search of any person who is suspected of having concealed upon his person a deadly weapon. Such search of a person so suspected shall be limited to the search for concealed deadly weapons only, and shall be conducted in such fashion as to determine solely the presence of such a weapon."

Title 11 *Del. C.* (part of the Uniform Arrest Act), § 1903 provides:

"A peace officer may search for a dangerous weapon any person whom he has stopped or detained to question as provided in section 1902 of this title, whenever he has reasonable ground to believe that he is in danger if the person possesses a dangerous weapon. If the officer finds a weapon, he may take and keep it until the completion of the questioning, when he shall either return it or arrest the person. The arrest may be for the illegal possession of the weapon."

Title 11 *Del. C.* § 1902(a) (referred to in the statute just quoted) provides:

"(a) A peace officer may stop any person abroad who he has reasonable ground to suspect * * * is about to commit a crime, and may demand of him his name, address, business abroad, and where he is going."

Title 11 *Del. C.* § 1906, provides:

"(a) An arrest by a peace officer without a warrant for a misdemeanor is lawful whenever he has reasonable ground to believe that the person to be arrested has committed a misdemeanor—

"(1) in his presence; * * *."

I have heretofore pointed out and discussed that where it was apparent to Trooper O'Neal that defendants' jacket pockets contained heavy objects, he could proceed to "frisk" them, under the provisions of Title 11 *Del. C.* § 462, and of Title 11 *Del. C.* § 1903, which authorize peace officers to "search" any "person whom he has stopped or detained to question" for "deadly" or "dangerous" weapons if the person "is suspected of having concealed upon his person a deadly weapon" or if "he has reasonable ground to believe that he is in danger if the person possesses a dangerous weapon". It seems clear that Trooper O'Neal must have recognized, as he observed Moore and Willin face to face, that the heavy objects in their jacket pockets were "deadly" or "dangerous" weapons, in the form of revolvers; consequently, it can be said he had just grounds to suspect they had "concealed upon" their persons a "deadly weapon" and he had "reasonable ground to believe that he" was "in danger if either or both of them possessed a dangerous weapon. Under these statutes he could arrest them for violating the law condemning the carry- of concealed deadly weapons.

There are numerous cases which uphold the power of a

peace officer to arrest, without a warrant persons carrying concealed a deadly weapon. *Welch v. State,* 107 Tex. Cr. R. 101, 294 S. W. 1110 (1926); *Salasar v. State,* 108 Tex. Cr. R. 381, 1 S. W. 2d 314 (1928); *State v. Hart,* 66 Idaho 217, 157 P. 2d 72 (1945); *Ballard v. State,* 43 Ohio St. 340, 1 N. E. 76 (1885) and *North v. People,* 139 Ill. 81, 28 N. E. 966 (1885).

The discussion in *State v. Hart, supra,* is most interesting. Defendant had been previously arrested on another charge. Later he was charged with carrying concealed a deadly weapon *viz.* a revolver. He had been involved in a disturbance and peace officers had gone to arrest him for that offense and when he was apprehended, the arresting officers observed his coat fly open. A Colt automatic revolver was observed in a vest pocket. Defendant was later charged with violating the Idaho law condemning the carrying of concealed deadly weapons. The police had no warrant to arrest defendant on this charge and the offense took place at night. This charge was said to have been without legal foundation and invalid because there had been no arrest for that offense and no warrant to search for the gun. A motion to suppress the gun, as illegally obtained from defendant, was filed. An Idaho statute provided (157 P. 2d 74):

"Section 19-603, I. C. A., sets forth clearly and fully the times and circumstances under which any peace officer may make an arrest, as follows:

" 'A peace officer may make an arrest in obedience to a warrant delivered to him, or may, without a warrant, arrest a person:

" '1. For a public offense committed or attempted in his presence.' "

On appeal from conviction on the charge the Supreme Court of Idaho said (157 P. 2d 75):

"There seems no good reason why the language of sub-

division 1 of Sec. 19-603, I. C. A., should be given such an interpretation as will hinder peace officers in their conscientious and diligent efforts to enforce the law and keep the peace. And, notwithstanding the existence of some authorities to the contrary, it seems to us that an individual who is in fact violating the law in the immediate presence of an officer and freely and voluntarily admits the facts constituting such violation, is committing an offense in the officer's presence within the meaning of said statutory provision and may be lawfully arrested without a warrant. Seaches and seizures made incidental to a lawful arrest are not prohibited as being unreasonable, and the evidence seized is not thereby rendered inadmissible. *State v. Conner, supra* [59 Idaho 695, 89 P. 2d 197]. It may be argued that defendant only admitted the possession of the blackjack, billy or sap, and that it was not such a weapon as is covered by the provisions of the ordinance. It is true it is not one of the weapons therein specifically mentioned; but, in addition to those, all other dangers and deadly weapons are included. The defendant urges that this particular instrument was neither dangerous nor deadly. At the same time he urges that solely by reason of his possession and exhibition of this instrument he was able to avoid and prevent a pre-arranged and deliberated assault upon him by four U. S. Army officers, which would indicate that those gentlemen, who are not entire strangers to dangerous weapons, did not regard this blackjack or billy as lightly as does the defendant. It cannot be denied that such a weapon may be and is dangerous and even deadly, depending upon the manner in which it is used.

"The arrest being legal, the seizure was not unwarranted and the motion to suppress was properly denied"

*Haerr v. United States*, 240 F. 2d 533 (5th Cir., 1957) and *People v. Bouchard*, 161 Cal. App. 2d 302, 326 P. 2d 646 (1958) are cited by defense counsel in support of his contention that—

"* * * When O'Neal 'frisked' Moore and Willin he 'searched' them within the meaning of that term as it is understood and applied in the law of search and seizure. * * *"

Neither case, on examination, shows that any "frisking" was involved. The *Haerr* case involved an arrest for unlawful acquisition of marijuana in violation of a Federal statute. Defendant had been stopped at night by Immigration Officers at a "check point" near the Mexico border. An Immigration Inspector had shined his flashlight into the back seat of the car and saw defendant in the case "hunched over two boxes on the floor, apparently attempting to hide them"; when he inquired what was in the boxes the car drove away at a rapid rate of speed. The officers followed and as the pursuit was in progress they observed the boxes being thrown out of defendant's car. When defendant was ultimately apprehended he voluntarily told the officers what was in the boxes and on return to the place where the boxes had been thrown away. Defendant's contention in the cited cases was (240 F. 2d 535):

"Appellant, in his argument to exclude the marihuana as evidence, takes the position that an illegal search was instigated when Inspector Seeburger asked what was in the boxes and told the occupants of the automobile to pull over to the side. We cannot agree."

The Court of Appeals did say in discarding this contention:

"A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term implies exploratory investigation or quest. 79 *C. J. S.* Searches and Seizures. § 1. Stopping the automobile in quest of aliens was the duty of the Border Patrol, and it was a part of the performance of this duty to look into the automobile.

Mere observation, however, does not constitute a search. *United States v. Lee*, 1926, 274 U. S. 559, 47 S. Ct. 746, 71 L. Ed. 1202; *Ellison v. United States*, D. C. Cir. 1953 [93 U. S. App. D. C. 1], 206 F. 2d 476; *United States v. Strickland*, D. C. S. C. 1945, 62 F. Supp. 468.

"The Inspectors clearly had the right to interrogate the occupants of the automobile. *Hall v. United States*, 5 Cir., 1956, 235 F. 2d 248; *Carter v. United States*, 5 Cir. 1956, 231 F. 2d 232. There was nothing illegal or threatening in the question asked or the language employed by the Border Patrol. The investigator's conduct was reasonable in every respect and we cannot say that a search was ever instituted.

"Nor was there a seizure; appellant, by his own design and choice, threw the boxes containing marihuana from the car and there was no seizure in the legal sense when the Patrol returned to recover them. *Hester v. United States, supra* [265 U. S. 57, 44 S. Ct. 445, 68 L. Ed. 898], and *Lee v. United States*, 1954, 95 U. S. App. D. C. 156, 221 F. 2d 29. Our conclusion that there was no search or seizure disposes of other questions raised on this appeal * * *"

The *California* case shows, on analysis, 325 P. 2d at p. 647 that defendant had consented to the supposed search and seizure and the case, on appeal, was decided, 326 P. 2d at p. 648, on the basis there had been a consent. Citing a prior California decision, the California Appellate Court said:

" '* * * While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a "search". * * *' "

It has long been recognized that "frisking" of a person is to be distinguished from a "search". See *Kalwin Business Men's Ass'n, Inc. v. McLaughlin*, 126 Misc. 698, 214 N. Y. S. 99, 102 (1926).

I want now, however, to conclude my discussion as to

whether Trooper O'Neal had "probable cause" to make an "arrest" or "reasonable grounds" to suspect a crime was about to be committed, 11 *Del. C.* § 1902 (a), at the time he brought his car to a stop along side of the Moore car in the Shell station, to justify his acts thereafter and to do the things that followed his bringing his car to a stop there.

It is clear to me that the circumstances as related by Trooper O'Neal support the Court's findings that Trooper O'Neal did have "probable cause" to make an arrest or, to say the least, "reasonable grounds" to suspect a crime was about to be committed, to stop , "detain", "frisk" and then "arrest" the defendants. See *Draper v. United States*, 358 U. S. 307, 310, 312, 79 S. Ct. 329, 331, 333, 3 L. Ed. 2d 327 at pp. 329, 330, 332 (1959); in the *Draper* case the U. S. Supreme Court ruled, 358 U. S. at 310, 79 S. Ct. at 331, 3 L. Ed. 2d at 330 "probable cause" as used in the Fourteenth Amendment and "reasonable grounds" as used in the Narcotic Statute cited in the *Henry* case are substantial equivalents of the same meaning. I know of no reason why we cannot liken the term "probable cause" to the term "reasonable grounds" as used in 11 *Del. C.* § 1902(a). At a later point in the same opinion it was stated, quoting from prior rulings, 358 U. S. at 313, 79 S. Ct. at 333, 3 L. Ed. 2d at 332:

" 'In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' *Brinegar v. United States, supra,* 338 U. S. [160] at page 175, 69 S. Ct. [1302] at page 1310 [93 L. Ed. 1879]. Probable cause exists where 'the facts and circumstances within their [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. * * *'" This has already been noted, p. 811, in the excerpt quoted

from 5 *Am. Jur.* 2d in Section 48. Compare *Henry v. United States, supra.* The *Draper* case was decided on the basis of 26 U. S. C. (Supp. V) § 7607 added by § 104(a) of the Narcotic Control Act of 1956, 70 Stat. 570. The law gives Narcotic agents the power to make arrests without warrant for violations of the Narcotic Law—

"* * * where the violation as committed in the presence of the person making the arrest or when such person has reasonable grounds to believe that the person to be arrested has committed or is committing such violation."

Comparison of the quoted language cited in the *Draper* case with language found in comparable portions in the Uniform Arrest Act, particuuarly 11 *Del. C.* § 1902(a), convince me that the Uniform Arrest Act would have afforded a proper basis for Trooper O'Neal to stop, "detain", "frisk" and then "arrest" the defendants, and so any and all constitutional objections, such as are advanced by defendants must be put aside. He had gained sufficient information in his observations of the actions of those in the Moore car to have acquired the requisite "reasonable grounds" so as to justify his acts and they must be upheld. I hold that Trooper O'Neal had "reasonable grounds" under the circumstances known to him at the time to do what he did.

Defendants' counsel cites and argues from language appearing in *People v. Chiagles,* 237 N. Y. 193, 142 N. E. 583, 584, 32 A. L. R. 676 (1923), an opinion by the late Mr. Justice Cardozo while he was on the New York Count of Appeals, but defendants' counsel overlooks our statutes, 11 *Del. C.* § 462 and 11 *Del. C.* § 1902(a) and 1903, which empower our police to make searches of the person for suspected "deadly" or "dangerous" weapons under given conditions. These statutes make "lawful" under certain circumstances the act which Mr. Justice Cardozo had characterized as a "trespass" in the cited case. It is to be noted that Mr. Justice Cardozo ruled in the cited case at the cited pages:

"* * * Seach of the person becomes lawful when grounds for arrest and accusation have been discovered, and the law is in the act of subjecting the body of the accused to its physical dominion."

See also *Draper v. United States, supra.* Similarly, the United States Supreme Court set out what constitutes "probable cause" in *Stacey v. Emery,* 97 U. S. 642, 645, 24 L. Ed. 1035, and from the "facts and circumstances" that Trooper O'Neal had observed that morning, it would appear that he, as "a man of prudence and caution", would be justified in taking the action he did. There is no resemblance between what transpired in the case at bar and the authorities, such as *Smallwood v. District of Col.,* D. C. Mun. App., 116 A. 2d 599 and *Carroll v. United States,* 267 U. S. 132, 45 S. Ct. 280, 69 L. Ed. 543 (1925), relied on by defendants. They compare, in many respects, with the *Henry* case, where it was said the F. B. I. agents were relying on rumor when they apprehended Henry. Here Trooper O'Neal personally saw the acts and circumstances committed by the occupants of the Moore car in his presence.

We must place ourselves in the position of Trooper O'Neal in the early hours of February 27, 1962. He observed an automobile, driving slowly, in the vicinity of an "all night" gas station—in fact, driving in a manner that caused the car to "swerve". To say the least that conduct would have aroused his interest—even his suspicions. Had the car gone on, there would have been no occasion for Trooper O'Neal to have any other or further suspicions; that, however, was not the case. He saw this same car a short time later, driven by the same man, but across on an adjoining dual lane, on the inside lane of the same route, and again driving at a slow rate of speed and Moore observing this same gas station. But that's not all; Trooper O'Neal again saw the same car and the same driver, again driving at a slow rate of speed on the same route, near this same gas station, and then pulling off to the right,

across the three lanes of traffic that make up northbound lanes of Route No. 13, and come to a stop at and before a gas station—not too far distant from the first station, the one in which defendants had demonstrated such great and continuing interest—only this gas station was closed for the night.

I think—as probably Trooper O'Neal did at the time—he had to investigate the car at that time, do what he could and make the inquiries permitted by the Uniform Arrest Act, find out what was the business of the driver of the Moore car, and then to take such action as circumstances dictated or justified.

In *United States v. Rabinowitz, supra,* the Supreme Court of the United States ruled that the real test of a "reasonable" or "unreasonable" search and seizure depends "upon the facts and circumstances—the total atmosphere of the case."

Comparing what has been ruled and stated by the Supreme Court in heretofore cited cases and in light of the circumstances which Trooper O'Neal observed of the conduct of the occupants of the Moore car in the early morning of February 27, 1962, I rule that "the facts and circumstances—the total atmosphere" of the case justified the Trooper's actions and I, therefore, hold that there was a "reasonable" seizure and search of the defendants. It is impossible to reach any other conclusion than to hold Trooper O'Neal did what he was expected to do under the circumstances. See the language in Mr. Justice Clark's dissent in the *Henry* case cited *supra,* at page 812. His conduct was in all respects legal and valid; his search, under the statute, 11 *Del. C.* § 462 and 11 *Del. C.* § 1903, of the persons of Moore and Willin was in accord with the law and having found the weapons on their persons it was highly proper—in fact obligatory—to arrest these defendants for violation of Title 11 *Del. C.* § 463.

Moore's arrest, at least, can be upheld on another ground,

which I will now discuss. The fact that it is discussed is not to be interpreted as evidencing any doubt whatsoever on what has been said heretofore. I discuss the point only because it is raised in the defendants' brief and so I consider it should be passed upon.

At the times that Trooper O'Neal observed the Moore car operating in the vicinity of the all night gas station, Moore was driving it at a slow rate of speed on at least one occasion, on the "left" or "inside" lane of the northbound lane of Route No. 13, which at this point has three lanes of traffic in both the northbound and southbound lanes, separated by a fairly wide strip of grass. The evidence showed there was very little, if any, other traffic passing over the other lanes.

Title 21 *Del. C.* § 4130(a) provides:

"Upon *all* highways of sufficient width, except upon one way streets, *the driver of a vehicle shall drive* the vehicle upon the right half of the highway and shall drive *a slow moving vehicle as closely as possible to the right-hand edge or curb of such highway,* unless it is impracticable to travel on such side of the highway and except when overtaking and passing another vehicle subject to the limitations applicable in overtaking and passing set forth in this chapter." (Emphasis supplied)

Counsel for the defense contends the statute is not applicable and so Moore cannot be held under the cited statute. I find the statute is quite clear in its language and intendment; I can see no merit whatsoever in the contentions advanced by defendants that the cited statute does not apply to dual highways—where there are three lanes of traffic and where these lanes are separated by a grass strip or where a medial line separates the different lanes. It is not a question of construction; the language in the statute is clear and meaningful; it has a good purpose which should be effectuated, and since Moore was unquestionably driving on the inside lane of Route

No. 13, in violation of the statute, Trooper O'Neal had clear justification to arrest Moore at least, since a misdemeanor was at that time committed "in his presence", Title 11 *Del. C.* § 1906(a) (1).

An order may be presented denying defendants' motions to suppress. Such order shall provide that Trooper O'Neal had "probable cause" to arrest defendants for the various reasons appearing in this opinion or "reasonable grounds to believe" a crime was in the course of commission or about to be, which he was required to prevent, as well as to arrest Moore for violation of Title 21 *Del. C.* § 4130(a). It may also provide that the State's motion to dismiss defendants' motions to suppress be denied, Rule 41(e), Superior Court Rules of Criminal Procedure, *Del. C.* The remedy provided by 11 *Del. C.* § 2310, was repealed by 50 *Del. Laws*, Ch. 52. It is true that defendants underwent trial before the Court of Common Pleas without raising the issues presented by their motions to suppress, and that the case was in this Court for a considerable period of time. It was not, however, until May 17, 1962 that counsel was appointed for defendants on their showing of indigency. The motions to suppress were filed on July 6, 1962—after counsel had announced they were ready for trial.

It perhaps could be argued with some force and logic, see *Isaacs v. United States*, 283 F. 2d 587, 589, 590, (10 Cir., 1960), that having gone to trial before the Common Pleas Court without challenging the arrest and the search, they thereby "waived" their rights to thereafter raise the questions, and therefore their motions came too late. In *United States v. Hortze*, 179 F. Supp. 913, 914, 915 (U. S. D. C. S. D. Cal. 1959) the Court entertained a motion to suppress made in the course of the trial.

This Court takes judicial notice usually that the Court of Common Pleas does not appoint counsel for in-

digent persons and there is nothing in the record of the appeals indicating the appointment of counsel for these defendants. It well has been said that a person who is in ignorance of a legal right does not waive it by his failure to assert it promptly, as may otherwise be the case if he has counsel. The *Isaacs* case, cited above, can be differentiated in some respects from this case and so I do not consider it authoritative. Then, too, Rule 41 appears to give this Court some discretion in the handling of these motions to suppress and I consider these cases have facts and circumstances which required a careful consideration of the defendants' contentions; this is only another reason for my denying the State's motion to dismiss defendants' motions to suppress.