Pamela G. **DISABATINO**, Appellant,

v.

**STATE of Delaware**, Appellee.

**ID No. 0006005759.**

Superior Court of Delaware,
New Castle County.

Submitted: Jan. 25, 2002.
Decided: Feb. 27, 2002.

---

# 1217

R. David Favata, Esquire, Paul R. Wallace, Esquire, Department of Justice, Wilmington, for Plaintiff Below/Appellee the State of Delaware.

Louis B. Ferrara, Haley, Bevis & Solomon, Wilmington, for Defendant Below/Appellant Pamela DiSabatino.

## MEMORANDUM OPINION

JURDEN, J.

The matter before the Court is an appeal of a decision of the Court of Common Pleas finding the Appellant, Pamela G. DiSabatino, guilty of Driving Under the Influence in violation of 21 *Del. C.* § 4177(a). For the reasons that follow, the decision of the Court of Common Pleas is **AFFIRMED**.

### I. *Procedural and Factual Background*

At 12:12 a.m. on May 21, 2000, Delaware State Police Trooper Eric T. Huston was dispatched to investigate a reported motor vehicle collision at the intersection of Harmony Road and Delaware Route 2 in New Castle County. When Trooper Huston arrived at the scene at 12:22 a.m. he found DiSabatino standing beside a damaged 1989 gray Ford Mustang. Trooper Huston questioned DiSabatino about the accident and asked for her license, registration and insurance information. DiSabatino's license indicated her date of birth was January 20, 1980, and he therefore concluded DiSabatino was twenty years old. DiSabatino told Trooper Huston that she lost control of her vehicle as she was attempting to turn left from westbound Delaware Route 2 onto southbound Harmony Road. DiSabatino reported that she struck a center median curb, bounced off the curb and then came to rest after striking a "caution" sign. Huston detected the smell of alcohol on DiSabatino's breath and noticed her eyes were glassy and bloodshot. Based upon these observations, Trooper Huston asked if she had consumed any alcohol. She admitted that she had consumed a couple of beers. Trooper Huston concluded that there was probable cause to believe DiSabatino had violated 21 *Del. C.* § 4177(L), zero tolerance for underage consumption. Violation of the zero tolerance statute requires evidence demonstrating a blood alcohol concentration of .02 or more.[1] At this point, Trooper Huston took DiSabatino into custody and transported her to Troop 6 for further investigation of the suspected zero tolerance violation.

At Troop 6, Trooper Huston gave DiSabatino *Miranda* warnings. This occurred at 1:12 a.m. He then questioned DiSabatino further about the accident. She admitted that she consumed two or three "Miller Lite" beers at Valley's restaurant between 10:30 p.m. and 10:45 p.m. and left Valley's between 11:00 p.m. and 11:10 p.m. DiSabatino told Trooper Huston that she was driving when the accident occurred. She also told him the accident occurred at 11:30 p.m. Trooper Huston administered field coordination and physical tests. At 1:40 a.m. Trooper Huston administered an intoxilyzer test utilizing the Intoxilyzer 5000 machine. The result of this test was a Blood Alcohol Content ("BAC") of .10. Because DiSabatino's BAC was .10 within four hours of driving, she was charged with violating 21 *Del. C.* § 4177(a)(5) (Driving a Vehicle While Under the Influence) and 21 *Del. C.* § 4176 (Careless or Inattentive Driving).

DiSabatino pled not guilty to both charges and waived her right to a jury trial. A bench trial commenced in the

---

1. 21 *Del. C.* § 4177L.

Court of Common Pleas on the above charges on February 1, 2001 and continued on March 5, 2001. At the conclusion of the trial, the Court found DiSabatino guilty of Driving Under the Influence and not guilty of Inattentive Driving. This appeal followed.

DiSabatino raises four issues on appeal. First, she asserts that Trooper Huston's failure to Mirandize her at the scene prior to interviewing her required the exclusion of all statements made by her at the scene as well as the results of Trooper Huston's subsequent investigation. Second, because an internal calibration test of the Intoxilyzer 5000 machine yielded a result of .28 at the time DiSabatino's breathalyzer test was administered, the State was unable to establish that the Intoxilyzer 5000 machine was operating properly at the relevant time and therefore the result should not have been admitted into evidence. Third, DiSabatino's BAC of .10 represented an actual result somewhere in the range of .09 to .11, thus creating a reasonable doubt as to whether she was legally impaired at the time of the collision. Finally, because the BAC was administered two hours after DiSabatino had last driven, it failed to establish that she was "under the influence" while driving.

In response, the State asserts that the trial court properly denied DiSabatino's motion to suppress as untimely because she failed to file a written pre-trial motion to suppress pursuant to Court of Common Pleas rules. Second, the State argues that through its expert, State Chemist David

Sockrider, it was able to establish that the Intoxilyzer 5000 machine was working accurately and properly at the time of DiSabatino's intoxilyzer test. Third, the State points to the plain language of 21 *Del. C.* § 4177(g), which precludes any consideration of a margin of error inherent in the test. Finally, the State argues that 21 *Del. C.* § 4177(a)(5) was properly applied to DiSabatino and is constitutional.

## II. *Standard and Scope of Review*

■■■■ Statutory authority provides for appellate review by the Superior Court of decisions rendered by the Court of Common Pleas.[2] "Such appeal to the Superior Court shall be reviewed on the record and shall not be tried *de novo*."[3] In reviewing appeals from the Court of Common Pleas, this Court sits as an intermediate appellate court.[4] Accordingly, its purpose reflects that of the Supreme Court.[5] This Court's role is to "correct errors of law and to review the factual findings of the court below to determine if they are sufficiently supported by the record and are the product of an orderly and logical deductive process."[6] The Court may "review *de novo* questions of law involved in the case."[7]

## III. *Discussion*

### A. *Suppression of Statements and Fruits of Subsequent Investigation*

■■■ At trial, during the State's case-in-chief, the State attempted to elicit testimo-

---

**2.** 11 *Del. C.* § 5301.

**3.** *Id.*

**4.** *State v. Richards,* 1998 WL 732960 (Del.Super.).

**5.** *State v. Huss,* 1993 WL 603365 (Del.Super.), citing *Shipkowski v. State,* 1989 WL 89667 (Del.Super.).

**6.** *Steelman v. State,* 2000 WL 972663 (Del.Super.).

**7.** *Ensminger v. Merritt Marine Const. Inc.,* 597 A.2d 854, 855 (Del.Super.1988).

ny from Trooper Huston on direct examination regarding statements DiSabatino made at the scene of the accident. Before Trooper Huston could answer, defense counsel objected, stating:

> Your Honor, I'm going to object to anything that she said unless they Mirandized her ahead of time. The facts in this case are that ... [Trooper Huston] was not the first officer at the scene. She was placed into custody by a county officer, and so, anything he asks her has to be *Mirandized.*[8]

Defense counsel told the Court that DiSabatino was prepared to establish through her testimony that a County Police officer who arrived first on the scene effectively placed DiSabatino under arrest. The State objected to the untimeliness of defendant's suppression motion and argued that DiSabatino was not in custody at the time the statements were given, but was only being detained by the County Police officer pending arrival of the State Police to investigate the accident.

It is undisputed that prior to trial defense counsel was provided with a copy of the Accident Report, Alcohol Influence Report and the Intoxilyzer 5000 printout. These documents included statements made by DiSabatino to Trooper Huston at the scene and later at Troop 6 during the zero tolerance investigation. Despite this knowledge, DiSabatino waived, in writing, a case review, expressly noting there were no pre-trial issues that needed to be addressed by the Court. DiSabatino filed no pre-trial motions before the discovery cutoff date of January 15, 2001. Before the trial began, the Court asked counsel if there were any preliminary matters that needed to be addressed. Defense counsel stated there were none. Although DiSa-

batino was apprised well before trial of the statements to be used against her, she postponed her objection to their admission until the State called and began questioning its first witness. The Court overruled DiSabatino's objection as untimely under Court of Common Pleas Criminal Rule 12 and Trooper Huston was permitted to proceed with his testimony. Court of Common Pleas Rule 12(b) provides, in pertinent part:

> (b) *Pretrial Motions.* Any defense, objection, or request which is capable of determination without the trial of the general issue may be raised before trial by motion. Motions may be written or oral at the discretion of the judge. The following must be raised prior to trial:
>
> * * *
>
> (3) Motions to suppress evidence;
>
> * * *
>
> (f) *Effect of failure to raise defenses or objections.* Failure by a party to raise defenses or objections or to make requests which must be made prior to trial, at the time set by the Court pursuant to subdivision (c), or prior to any extension thereof made by the Court, shall constitute waiver thereof, but the Court for cause shown may grant relief from the waiver.

 It is within the discretion of the trial court to grant or deny a motion to suppress. Unless the reviewing court determines that the trial court has abused its discretion, the ruling will not be disturbed. Absent exceptional circumstances, a trial judge's refusal to hear an untimely motion to suppress on its merits is properly within the trial court's broad discretion of its rules of procedure.[9] Exceptional circumstances include a defendant's ignorance of

---

**8.** Trial Tr. at 6.

**9.** *See Darst v. State,* 2001 WL 312456 at *3 (Del.Super.); *See also Barnett v. State,* 691 A.2d 614, 616 (Del.1997).

his legal rights or failure to provide notice to a defendant that suppression was at issue before trial began.[10] In the case *sub judice,* this Court finds no abuse of discretion. The trial judge concluded, after extensive argument from the parties, that DiSabatino received information before trial that should have alerted her to the issue, and therefore she should have filed a motion to suppress. Moreover, the Court questioned whether *Miranda* warnings were required until Trooper Huston transported DiSabatino to Troop 6.[11]

As the trial judge correctly noted, if DiSabatino was uncertain as to when she was *Mirandized* and was concerned that her statements may have been improperly taken, she should have filed a motion to suppress.[12] The Court agrees with the trial judge that these concerns could have, and should have, been raised *before* trial. The trial judge exercised his discretion appropriately. The Accident Report, Alcohol Influence Report and Intoxilyzer 5000 test results included the statements DiSabatino sought to exclude at trial. Specifically, it is clear from the Alcohol Influence Report that DiSabatino admitted that she consumed a couple of beers. It is clear from the Accident Report she acknowledged that she lost control of her vehicle. DiSabatino conceded at trial that she knew she was not *Mirandized* until 1:12 a.m. Trooper Huston was on the scene fifty minutes before he *Mirandized* her.[13] DiSabatino had ample facts to file a timely suppression motion on this issue. In addition, DiSabatino was represented by experienced, competent counsel. Thus, she is presumed to have knowledge of her legal rights, thereby defeating any claim of exceptional circumstances. Accordingly, the trial court's decision overruling the objection to the admission of Trooper Huston's testimony is affirmed.

### B. Admission of DiSabatino's Intoxilyzer 5000 Test Result

 During trial, the State introduced evidence of DiSabatino's Intoxilyzer 5000 test result. The Intoxilyzer 5000 measures the blood alcohol content present at the time the test is administered and is tested monthly to ensure its proper functioning. The machine used in DiSabatino's case was tested on May 10, 2000, June 8, 2000, and immediately before and after DiSabatino's test was administered on May 21, 2000. Each time, three internal calibration checks were performed with target values of plus or minus five percent of .10, .20 and .30. On each of these three dates, the third internal calibration check was .28, which ostensibly could constitute more than a five percent difference from the target result of .30.

David Sockrider, the State Police Forensic Analytical Chemist, testified as the State's expert witness on the Intoxilyzer 5000 machine. Mr. Sockrider explained that the internal checks are engineered to pass if they are within a five-percent value of a target for each standard. The three internal standards are .10 for internal standard one, .20 for internal standard two and .30 for internal standard three. Five percent of these values, respectively, is .005, .010 and .015. Accordingly, acceptable results would include either adding or subtracting five-percent of the values to each internal check. At the time the test was administered, the results of the internal checks were displayed in a two decimal

---

**10.** *State v. Moore,* 187 A.2d 807 (Del.Super.1963).

**11.** Trial Tr. at 24.

**12.** Trial Tr. at 23.

**13.** Trial Tr. at 20.

format. Thus, for internal standard one, an acceptable two-digit readout would be .09 or .10. For internal standard two, an acceptable two-digit readout would be .19, .20 or .21. An acceptable readout for internal calibration three would be .28, .29, .30 or .31. Mr. Sockrider went on to explain that a failsafe mechanism exists within the machine wherein if there is a reading outside of the acceptable parameters, the machine will automatically fail. An error message would appear on the screen indicating the internal standard failed and that is the only result that would appear on the evidence card.

DiSabatino argues that because the internal calibration check for the third internal test yielded a result of .28, the State was unable to establish that the Intoxilyzer 5000 machine was operating properly. Specifically, she asserts the Intoxilyzer's failure to display the thousandths digit meant that the machine could have been obtaining a result anywhere in the range of .280–.289. Thus, according to DiSabatino, a result between .280–.284 would constitute a deviation in excess of the five-percent margin of error.

DiSabatino's argument that the State was unable to establish the Intoxilyzer 5000 machine was operating properly on May 21, 2000 is unsupported by the record. The Delaware Supreme Court has deemed the Intoxilyzer 5000 to be a scientifically reliable means of testing an individual's blood alcohol content so long as the State Chemist certifies that it was operating accurately before and after testing the breath of the defendant on trial.[14]

As previously noted, the internal calibration checks produced acceptable results both before and after DiSabatino underwent the test. Furthermore, as provided by Mr. Sockrider, while the Intoxilyzer is programmed to only produce two digit readouts, the built-in failsafe mechanism prevents it from generating a result outside of the acceptable parameters. Therefore, in the event the third internal check produced a result below .285, the test would have stopped, and all that would have appeared on the evidence card would have been an error message followed by language to the effect that the internal standard failed. That did not happen in this case. Mr. Sockrider testified that the third internal calibration test performed on May 21, 2000 was consistent with the results of the May 10th and June 8th tests, indicating, based on his experience in testing and repairing the Intoxilyzer machines, that it was working properly and within the manufacturer's specifications. Courts that have considered whether an internal calibration result of .28 for a target reading of .30 indicates the Intoxilyzer was properly functioning have concluded in the affirmative.[15] This Court agrees with that precedent in light of the unrebutted testimony of Mr. Sockrider.

### C. Admission of an Intoxilyzer Result of .10

■ Operating a motor vehicle with a prohibited alcohol content of .10 or more constitutes *prima facie* evidence of a violation of 21 *Del. C.* § 4177(a)(5). Evidence of the alcohol concentration is admissible

---

14. *Anderson v. State*, 1995 WL 717245 at *3 (Del.Super.), *aff'd*, 675 A.2d 943 (Del.1996), *cert. denied*, 519 U.S. 872, 117 S.Ct. 188, 136 L.Ed.2d 126 (1996).

15. *State v. Clough*, 2001 WL 1558054 (Del. Com.Pl.); In *State v. Helms*, Del.Super., Cr. A. No. 0008015338, during a hearing held on April 9, 2001 regarding a motion to suppress the Intoxilyzer results, the Honorable Peggy L. Ableman ruled from the bench that the internal calibration result of .28 for a target of .30 constituted an acceptable result to establish that the machine was functioning properly.

so long as a sample is taken within four hours of driving and reflects "an amount of alcohol present in, or consumed by the person when that person was driving." [16] The clear language of the statute also provides that laboratory test results measuring alcohol concentration in a person's blood, breath or urine "shall be deemed to be the actual alcohol or drug concentration ... *without regard to any margin of error or tolerance factor inherent in such tests.*" [17] It is undisputed that the legislature is authorized to enact a statute prohibiting a BAC of less than .10.[18] Finally, an accused may be convicted under this statute based on admissible evidence "*other than the results of a chemical test* of a person's blood, breath or urine to determine the concentration or presence of alcohol or drugs." [19]

Notwithstanding the clear import of the statutory language noted above, DiSabatino argues that because her BAC result was .10, and the Intoxilyzer 5000 had a five percent margin of error, her actual BAC could have been between .095 and .105.[20] Therefore, she reasons, the State failed to prove beyond a reasonable doubt that her BAC was .10 or greater.[21]

This argument is without merit. During trial, the court was presented with an abundance of evidence to support a finding that DiSabatino was under the influence of alcohol while driving her vehicle in violation of 21 *Del. C.* § 4177. Trooper Huston testified that upon his arrival at the scene of the accident, he detected the presence of alcohol on DiSabatino's breath and noticed that her eyes were bloodshot and glassy. DiSabatino admitted to Trooper

Huston that she consumed 2–3 beers at Valley's Restaurant between 10:30 p.m. and 10:50 p.m. whereafter she left the restaurant and drove her vehicle toward the Burlington Coat Factory. The Alcohol Influence Report admitted at trial included the results of the field tests conducted at Troop 6, during which DiSabatino committed some errors. Finally, Trooper Huston testified that DiSabatino underwent the Intoxilyzer 5000 test at 1:40 a.m. producing BAC result of .10. DiSabatino completed this test within four hours of driving and did not consume any alcohol between the time of the collision and her arrest. DiSabatino's demeanor, admissions and blood alcohol concentration measured within four hours of driving all point to one conclusion. She was driving while under the influence. The trial court's decision is in accord with the statutory prohibitions of *21 Del. C.* § 4177 and correctly makes no allowances for a margin of error with the Intoxilyzer 5000 test.

The Court is satisfied that the quantum of evidence produced at trial provides ample support for DiSabatino's conviction and the decision below is free from legal error.

### D. *Constitutionality of 21 Del. C. § 4177*

◼ DiSabatino argues that, notwithstanding recent amendments, 21 *Del. C.* § 4177 remains unconstitutionally overbroad and vague. Specifically, she alleges that because the State failed to determine her BAC at the time of the accident and simply relied on a BAC result that was measured within four hours after the collision it remains constitutionally infirm. Ac-

---

**16.** 21 *Del. C.* § 4177(a)(5).

**17.** 21 *Del. C.* § 4177(g) (*emphasis supplied*).

**18.** *State v. Baker*, 720 A.2d 1139, 1145 (Del. 1998).

**19.** 21 *Del. C.* § 4177(g)(2) (*emphasis supplied*).

**20.** Appellant's Opening Br. at 9.

**21.** *Id.*

cording to DiSabatino, in light of the temporal distance existing between the time of her accident and the BAC test, she could have actually had a BAC of less than .10 at the time of the accident which would have served to exculpate her from the charges. She alleges that prosecution for this type of result serves to punish behavior the General Assembly did not intend to prohibit and fails to provide adequate notice of the type of conduct actually proscribed.

In its response, the State articulates that in light of the General Assembly's 1999 amendments to the statute at issue, it is neither overbroad or vague. Pointing to the clear language of the statute itself, the State argues that successful prosecution requires that the State prove beyond a reasonable doubt a sequential nexus between drinking alcohol and then driving such that the blood alcohol concentration discovered within fours hours of a person's driving "is the result of an amount of alcohol present in, or consumed by the person when that person was driving."[22] In addition, the statutory prohibitions do not reach conduct that the General Assembly did not intend to prohibit. When an individual tests positive for a BAC at or above .10 as a result of alcohol consumed after driving has ceased, he or she is not subject to prosecution under this statute.[23] Consequently, the State contends that the statute as amended "does not reach conduct that the legislature did not intend to proscribe."[24] The State also argues the statute at issue is not void for vagueness because the amended provisions clearly provide notice to all individuals of the type of behavior that is forbidden. The statutory language prohibits persons from con-

suming alcohol before or during the operation of a motor vehicle when the quantity of consumed alcohol is sufficient to raise an individual's BAC to .10 or above within four hours of driving. Thus, it gives "a person of ordinary intelligence fair notice that his contemplated behavior is forbidden by the statute."[25]

Before the General Assembly amended 21 *Del. C.* § 4177 in 1999, it read, in pertinent part, as follows:

**21 *Del. C.* § 4177. Driving a vehicle while under the influence; evidence; arrests; and penalties.**

(a) No person shall drive a vehicle:

(1) When the person is under the influence of alcohol;

(2) When the person is under the influence of any drug;

(3) When the person is under the influence of any combination of alcohol and any drug;

(4) When the person's alcohol concentration is .10 or more; or

(5) When the person's alcohol concentration is, within 4 hours after the time of driving, .10 or more.

(b) In a prosecution for a violation of subsection (a) of this section

\* \* \*

(2) It shall be an affirmative defense to a prosecution premised on subsection (a)(5) of this section if the person proves by a preponderance of the evidence that the person consumed a sufficient quantity of alcohol after the time of driving and before any sampling to cause the person's alcohol concentration to ex-

---

**22.** 21 *Del. C.* § 4177(a)(5).

**23.** 21 *Del. C.* § 4177(b).

**24.** *State v. Baker,* 720 A.2d 1139, 1145 (Del. 1998).

**25.** *Sanders v. State,* 585 A.2d 117, 127 (Del. 1990).

ceed .10. Such evidence shall not be admitted unless notice of this defense is given to the prosecution at least 20 days before the trial.

* * *

(c) For purposes of ... this section ..., the following definitions shall apply:

* * *

(3) "Drive" shall include driving, operating, or having actual physical control of a vehicle.

* * *

(5) "While under the influence" shall mean that the person is, because of alcohol or drugs or a combination of both, less able than the person would ordinarily have been, either mentally or physically, to exercise clear judgment, sufficient physical control, or due care in the driving of a vehicle.

* * *

(g) For purposes of a conviction premised upon subsection (a) of this section, or any proceeding pursuant to this Code in which an issue is whether a person was driving a vehicle while under the influence, evidence establishing the presence and concentration of alcohol or drugs in the person's blood, breath or urine shall be relevant and admissible ...

(1) Evidence of an alcohol concentration of .05 or less in a person's blood, breath or urine sample taken within 4 hours of driving and tested as defined in subsection (c)(2) of this section is prima facie evidence that the person was not under the influence of alcohol within the meaning of this statute ....

The amended statute provides, in pertinent part:

**21 *Del. C.* § 4177 *as amended.* Driving a vehicle while under the influence or with a prohibited alcohol content; evidence; arrests; and penalties.**

(a) No person shall drive a vehicle:

(5) When the person's alcohol concentration is, within 4 hours after the time of driving .10 or more. Notwithstanding any other provision of the law to the contrary, a person is guilty under this subsection, without regard to the person's alcohol concentration at the time of driving, if the person's alcohol concentration is, within 4 hours after the time of driving .10 or more and that alcohol concentration is the result of an amount of alcohol present in, or consumed by the person when that person was driving.

(b) In a prosecution for a violation of subsection (a) of this section:

(2)a. No person shall be guilty under subsection (a)(5) of this section when the person has not consumed alcohol prior to or during driving but has only consumed alcohol after the person has ceased driving and only such consumption after driving caused the person to have an alcohol concentration of .10 or more within 4 hours after the time of driving.

b. No person shall be guilty under subsection (a)(5) of this section when the person's alcohol concentration was .10 or more at the time of testing only as a result of the consumption of a sufficient quantity of alcohol that occurred after the person ceased driving and before any sampling which raised the person's alcohol concentration to .10 or more within 4 hours after the time of driving.

(g) For purposes of a conviction premised upon subsection (a) of this section, or any proceeding pursuant to

this Code in which an issue is whether a person was driving a vehicle while under the influence, evidence establishing the presence and concentration of alcohol or drugs in the person's blood, breath or urine shall be relevant and admissible. Such evidence may include the results from tests of samples of the person's blood, breath or urine taken within 4 hours after the time of driving or at some later time. In any proceeding, the resulting alcohol or drug concentration reported when a test, as defined in subsection (c)(2) of this section, is performed shall be deemed to be the actual alcohol or drug concentration in the person's blood, breath or urine without regard to any margin of error or tolerance factor inherent in such tests.

(1) Evidence obtained through a preliminary screening test of a person's breath in order to estimate the alcohol concentration of the person at the scene of a stop or other initial encounter between a law enforcement officer and the person shall be admissible in any proceeding to determine whether probable cause existed to believe that a violation of this Code has occurred.

 Courts charged with the task of statutory construction engage in a *de novo* standard of review.[26] "A fundamental rule of statutory construction is that the Court will endeavor to give a statute a construction which renders the statute constitutionally valid."[27] Accordingly, if feasible, courts will construe a statute accused of being vague in such a manner so as to avoid a finding of constitutional infirmity.[28] When the General Assembly amends a prior statutory enactment by materially changing the language, rules of statutory construction create a presumption that a change in the meaning of the statute was intended.[29] "In making material changes in the language of a statute, the legislature can neither be assumed to have regarded such changes as without significance, nor to have committed an oversight or to have acted inadvertently."[30] The party who avers that no change was intended in a law by a legislative amendment has the burden of establishing that intent.[31]

According to the United States Supreme Court:

In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a *substantial* amount of constitutionally protected conduct. If it does not, then the overbreadth challenge must fail. The court should then examine the facial vagueness challenge, and assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications.[32]

**26.** *Richardson v. State,* 673 A.2d 144 (Del. 1996).

**27.** *State v. Colasuonno,* 432 A.2d 334 (Del.Super.1981).

**28.** *United States v. Harriss,* 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954).

**29.** *Daniel D. Rappa, Inc. v. Engelhardt,* 256 A.2d 744 (Del.1969).

**30.** 73 Am.Jur.2d *Statutes* § 132 (2001).

**31.** *Stiftel v. Malarkey,* 384 A.2d 9 (Del.1977).

**32.** *Village of Hoffman Estates v. Flipside, Hoffman Est.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (*emphasis added*).

The Court begins its overbreadth analysis by examining the legislative purpose of the 1999 amendments as set forth in the synopsis to that legislation. The DUI statute is designed to protect the citizenry of this State from the inherent dangers lurking when one consumes alcohol and then proceeds to drive a vehicle.[33] After the Supreme Court found the predecessor statute to 21 *Del. C .* § 4177 to be unconstitutionally overbroad and vague, the General Assembly went back to the drawing board in an attempt to remedy the constitutional infirmities while effectuating the above-mentioned intent. Specific statutory language was inserted to prohibit drunk drivers from evading prosecution "simply because, at the time of the stop, their [alcohol concentration] had not yet reached the proscribed level"[34] while simultaneously insuring that individuals would not be subject to arrest when their alcohol consumption giving rise to the proscribed limit occurred *after* they stopped driving. According to the synopsis of the amendments:

> This Act seeks to remedy any perceived constitutional infirmity by ensuring that what was implicit in 21 *Del. C.* § 4177 (Supp.1995) is now explicitly set forth in the law—that persons who drove with a sufficient amount of alcohol in their system to raise their alcohol concentration to .10 or more within 4 hours of driving are subject to prosecution but persons whose drinking and driving are unrelated are not. Thus, the Act targets only those persons who are behind the wheel with a sufficient quantity of alcohol ·in

their bodies to raise their alcohol concentrations to .10 or above within 4 hours.[35]

With this legislative purpose in mind, the Court now considers whether the DUI statute reaches a substantial amount of constitutionally protected conduct. Overbreadth is found when a statute "does not aim specifically at evils within the allowable area of government control, but ... sweeps within its ambit other activities that constitute an exercise of protected expressive or associational rights."[36] Overbreadth may be claimed despite the fact that targeted conduct falls within an allowable area of control if the challenger demonstrates that the statute is "overbroad in a real and substantial manner" and "no limiting construction is possible."[37]

The State asserts that the 1999 amendments to the DUI law have corrected the offensive portions such that:

> [P]ersons whose drinking and driving are unrelated no longer are subject to prosecution under the DUI law. It is clear under the present law that the sequence of drinking and driving must be such that the person had a certain amount of alcohol present in his or her body prior to or during driving to be in danger of prosecution under 21 *Del. C.* § 4177.[38]

DiSabatino challenges the amended statute as "defective when measured against the standards enunciated in *Baker,* and

**33.** H.R. 44, 140th General Assembly (Del. 1999).

**34.** *Id.*

**35.** Id.

**36.** *United Video Concepts, Inc. v. Dover,* 1994 WL 682321 at \*2 (Del.Super.), *quoting* L.

Tribe, AMERICAN CONSTITUTIONAL LAW, § 12–24, p. 710, *aff'd,* 660 A.2d 396 (Del. 1995).

**37.** *United Video Concepts, Inc.,* 1994 WL 682321 at \*2.

**38.** Appellee's Answering Br. at 13.

especially as applied"[39] and supports her claim by accusing the State of failing to prove that her BAC was .10 at the time the accident occurred. This argument mirrors the complaint raised by the appellee in *Baker*.[40] In that case, the Supreme Court struck down the previous DUI statute on the grounds that it was unconstitutionally overbroad and vague. The Supreme Court found that 21 *Del. C.* § 4177(a)(5), as drafted, was unconstitutionally was overbroad because it "makes no distinction between the sequence of drinking" thus triggering "a real probability that individuals will be punished for consuming alcohol that was not associated with the operation of a motor vehicle."[41] The Court in *Baker* specifically held the statute overbroad because, first, "the statute as written would include an individual who drinks only after driving . . . . Second, the statute would include a person who drove with a BAC of .05 or less but whose BAC rose to .10 within the ensuing four hours."[42] According to the Court in *Baker*: "A person who drives with a BAC of .05 or less, and it not "under the influence" as defined, but whose BAC rises to .10 within four hours of the time of driving may not be certain his or her conduct is proscribed".[43]

In comparing the present DUI statute with its predecessor, it is apparent that the overbreadth identified by the Court in *Baker* was rectified by the specific language in the 1999 amendments. Section 4177(a)(5) precludes prosecution of individuals who consume alcohol after they have ceased driving. Section 4177(g)(1) was also revised by the 1999 amendment to insure persons were on notice of what conduct is proscribed. These changes remove all doubt about the circumstances under which an individual can be arrested and prosecuted for driving while under the influence of alcohol. Because constitutionally protected conduct is not subject to prosecution in the new version of the DUI statute, this Court finds that it is constitutionally sound and not overbroad.

■ The Court will now turn to DiSabatino's claim of vagueness. In order to avoid vagueness, penal statutes must be drafted with sufficient precision that ordinary individuals are put on notice of the type of conduct that is prohibited.[44] By so doing, arbitrary and discriminatory enforcement is discouraged.[45] Otherwise, "a criminal statute may permit 'a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.' "[46]

The predecessor DUI statute was vague because it allowed for the prosecution of persons who consumed alcohol only after they stopped driving as well as individuals who drove with a BAC of .05 or less, and thus, not 'under the influence', but whose BAC rose to .10 within four hours of the time of driving.[47] As noted above, the Court in *Baker* held that this version of the statute did not give persons of ordinary intelligence adequate notice of proscribed conduct and it encouraged arbi-

---

**39.** Appellant's Opening Br. at 10.

**40.** *State v. Baker,* 720 A.2d 1139 (Del.1998).

**41.** *Id.* at 1145.

**42.** *Id.* at 1147.

**43.** *Id.*

**44.** *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983).

**45.** *Id.*

**46.** *Id.*

**47.** *Baker,* 720 A.2d at 1149.

trary enforcement.[48]

In contrast, the amended statute provides adequate notice to persons of ordinary intelligence that his or her contemplated behavior is forbidden. It does so by clearly announcing the circumstances that would render individuals susceptible to prosecution. First, an individual must consume alcohol before or while operating a motor vehicle. Second, that level of alcohol must rise to .10 or above within four hours of driving. Third, the level of alcohol present within that time frame must be "the result of an amount of alcohol present in, or consumed by the person when that person was driving."[49] This Court is satisfied that the amendments to the DUI statute sufficiently inform the general public of the prohibited conduct thus defeating DiSabatino's claim of vagueness.

## IV. *Conclusion*

Based on the foregoing analysis, this Court affirms the decision of the Court of Common Pleas and concludes that 21 *Del. C.* § 4177, as amended, withstands constitutional scrutiny.

IT IS SO ORDERED.

---

48. *Id.*

49. 21 *Del. C.* § 4177(a)(5).